Speaker at P.D.的話 echo Thank you, nursingassistants. Ladies and gentlemen, a courtesy briefing from I.T. hospital. You may please the court, your honor. My name is Michael Moschel. I'm representing Vanderbilt University. With me today is Senior Deputy Counsel of Vanderbilt, Mr. John Callison, and we would like to reserve three minutes for rebuttal. You may. This is a case of first impression under the Federal Warrant Act in this circuit, and it's for the court to decide whether an employee or employees who receive 60 days notice of a mass layoff under the Act, they're placed on a paid leave of absence, continue to receive their full pay and benefits, but are not required to perform any job duties during those 60 days, whether they suffer an employment loss on the date they receive the notice or on the date they cease receiving full pay and benefits and are then eligible to file for unemployment under the Tennessee Unemployment Laws. That's a really technical question, but it wasn't the university trying to beat this first group of people out of their rights? Absolutely not, your honor. And that was a... They didn't get the warning? They didn't get any pay? No, they didn't. And there is a group in July, and the group in July was certainly under the 500 number, which is the threshold. And the issue of whether or not the July plaintiffs, who are the plaintiffs in this case, and the folks who receive notice in September can be aggregated under the 90-day aggregation rule is not an issue that's before the court. This is a case that has been stipulated on a single issue, whether or not there was an employment loss for the group of 294 people who lost their jobs, we submit in November. Is there any problem about whether you can stipulate in effect to the court's jurisdiction here? We don't believe there is, your honor. This is a strange procedural background where the parties decided to resolve the case, this class action lawsuit, and submit to the court's jurisdiction that one sole question of whether or not there was this employment loss of this group that received notice in September. I understand that. Legally, is that something you can do? I mean, I suppose there were only 50 people, clearly, that, hey, we'd like to have the court decide this issue. We couldn't do it in that case, but for purposes, we conceded at the lower court for purposes of this case that if there is an aggregation, there would be at least 500 people. Whether it's true or not? Well, and there was a real question of fact of whether or not it was true, and that's why the parties decided to settle. There were a bunch of temporary employees. Okay, well, we'll go on to the merits part. We'll keep that in mind. Thank you, your honor. So we're on stipulated facts and a stipulated issue, and this is subject to de novo review. So this is a first brand-new look at this case. And, of course, the WARN Act requires employers to provide 60 days' notice of terminations, mass layoffs, and permanent plant shutdowns. And WARN defines the employment loss as an employment termination other than a discharge for cause or voluntary departure or retirement, but the Act doesn't define the term employment termination. The Department of Labor has explained in its regulations and was adopted by this circuit in the Wiltz case that the term termination is to have a common-sense meaning of the permanent cessation of the employment relationship. In Vanderbilt, we submit that's a very strong burden, very strong standard. That suggests finality. And here we have a group of employees who received their WARN notices on November 17, 2013, informing them that their jobs would be eliminated on November 16, 2013. Similar notices were sent to the Tennessee Department of Labor, Workforce Development, and the mayor of Nashville. The notices allowed the employees to be placed on a paid leave but would not be required to report to work. Importantly, they were to receive their full pay and benefits, and that's been stipulated. And they would continue to accrue benefits while they were on that leave of absence. They were told to use that time, that full time, to look for other employment, which certainly is more advantageous for someone who is about to be separated. It gives them a full time to look for another job. They were provided career transitions. Isn't it severance pay? I mean, you say you're fired, but we're going to give you severance. No, Your Honor. In fact, people were entitled to severance in it. Some of the people were entitled to severance on top of the 60 days notice. So we don't consider that severance. They were on the full pay. We consider it severance, but isn't that what it amounted to? If I were to say I have employees and I say, just take a single employee, I'd say, you're fired, but this is kind of sudden, I know, so I'm going to give you six months severance pay and here's a covenant not to sue me. Sure. This happens all the time. So can you say that person wasn't terminated on the day that they were told this? Under those set of facts, there's most likely a permanent cessation of the employment relationship, but under these set of facts, they weren't asked to sign a release to get the 60 days pay. They were placed on an internal leave and they remained internal Vanderbilt candidates. They were allowed to get preferential treatment for other jobs and they weren't eligible to file for unemployment until the end of that 60-day period. Can you say that they kept their benefits so that if they had an accident after the 45th day, they could claim under their Vanderbilt health plan and you would have to process the paperwork so you would have a relationship with them? That's right, and they still continued to accrue additional vacation time and sick leave during those 60 days, which is different than what happens during a severance period. And I guess I will raise one of the issues that was raised by the plaintiff because it's very similar to your severance question, Judge Bertelsman, and that is the pay-in-lieu-of-notice argument. And, of course, the Department of Labor in its worker's guide asks the question, what happens if an employer pays me 60 days without sending me a warrant notice? And under those set of facts, they found that there was a technical violation. Here we have an actual warrant notice, and when you're dealing with pay-in-lieu-of-notice, you're assuming that there's not a permanent cessation of the employment, you're assuming that the permanent cessation of the employment relationship happens concurrently with the pay-in-lieu-of-notice. And that's not what happened here. And, in fact, the Department of Labor, who we submit that agency's interpretation of the law should be given controlling weight because it's not conflicting with the statute. In the final regulations, they answered a question that had been raised as to whether an employment loss occurs if an employee retains full pay-in benefits and other entitlements but is not required to report to work. And that... They're not permitted to report to work either. Right. Required to report. Here, they weren't even permitted. Exactly. Come on to premises. No. No. And that's very typical with... In the capacity of the employee. I guess if they want to come and walk around the campus, they can. If they had a health issue and had to go... And most of these workers, don't forget, were hospital workers. It sort of says, don't come around and even socialize. Right. And there's really nothing improper about that. And it's not necessarily a fact that shows employment termination or permanent cessation. We're talking about patient care issues. We're talking about a hospital. And it's just not appropriate for folks who are on leaves to socialize in a hospital while there's patient care happening. So the Department of Labor takes the position that you're not required to perform work. And then there's only one appellate decision in the Fourth Circuit, the long case, that we submit is directly on point. And under those set of facts, the Fourth Circuit found that the employment termination does not encompass a situation in which the employer continues to pay its employees full wages and benefits. The court concluded that when an employer commits to continued payment of wages and benefits to its employees, the employment relationship has not ended. And that was consistent with the purposes of the Warren Act, which is to allow employees and workers and their families transition time to adjust to their prospective loss of employment, to seek and obtain alternative jobs, and if necessary, to enter skilled or retraining that will allow the workers to successfully complete in the market. On that worker's guide that you adverted to a few minutes ago, as I read it, and correct me here if I'm wrong, it says it's a violation of the Act, but generally pay in place of notice means the employer has already met the penalty specified in the Act. So why is it important to you whether we consider it a violation but there's pay in place of notice? Good question, Your Honor. In this case, it's not pay in lieu of notice because pay in lieu of notice, the question was, what happens if my employer pays me 60 days without sending me a notice? Here there were actual notices telling them they'd be on a leave. Here is the date 60 days later that you will be without a job. And so pay in lieu of notice scheme assumes that there was a concurrent permanent cessation, and that's the standard we're under. And the Fourth Circuit continued that Congress did not seek to protect employees' expectations of performing work, only their expectations of receiving full pay and benefits. So this is exactly what happened in this case. Now the plaintiffs in this case make hay of the practical effects-driven analysis that was adopted by this circuit, that standard, to determine whether or not there was a break in employment. And we submit, Your Honors, that under this practical effects-driven analysis, there can still be no permanent cessation of the employment relationship while someone is receiving their full pay and benefits, accruing benefits, and also treated and remaining to be treated as an internal candidate for job openings. Also, the practical effects-driven analysis language comes from cases dealing with whether or not there's a technical termination loss in the sale of a business context. When you have an asset purchaser selling a company, and on day one employee works for the predecessor, on day two they immediately work for the successor. And under that, discussing the practical effects-driven analysis, this circuit said, in other words, where the termination is at best technical, we found no Warnack violation. And that just really is not at issue in this case. The clear language is whether or not there was a permanent cessation in the employment relationship. And under our facts, I don't believe that any reasonable trier of fact could find that when someone is continuing on a leave of absence with full pay and benefits, that they have been terminated permanently until after they cease receiving pay and benefits and they can file for unemployment benefits. Is there any difference in the nature of the employment of the first group? Were they people that didn't get the warning? There was a complete... They were the doctors? No, they were what we would call lower performers and people with disciplinary actions on their records. And they were let go in July for those reasons. And at that point, Vanderbilt didn't know whether or not it would need another employment action. And the people in the group of 274 who were given warn notices were a different type of administration to the system. They weren't dealing with people with low performance evaluations. They were discharging people in 60 days whose jobs were either redundant or they didn't need those jobs. So it was a different type of administration. We will acknowledge it was based upon the same financial problems the university was facing. My time is up. Can I answer any more questions? No. Did you just say the first group was 50? No, 194. 194, all right. Basically, the first group you were kind of culling the low-hanging fruit, but then it turned out you had to cut down the tree. Yes. Okay, thank you, counsel. You'll have your three minutes for rebuttal. May it please the court, Scott Tift on behalf of the class of appellees, former Vanderbilt employees who lost their jobs on July 1st, 2013, with no notice. Your Honor, is this case? Do you agree that the class is 194? The class size that yes, sorry, Your Honor.  And that's the class size? Yes. And the second group is 279? Well, the second group that was clearly identified as far as we got in discovery was, but Vanderbilt has stipulated on the record, as evidenced by the judge's opinion and as the transcript, it's stipulated that these two groups combined reach 500, even though we didn't complete discovery to line up every person. That's a stipulation on the record in the district court and in the district court's opinion. I got all that. That's not what I asked you. Sure. I asked you, is the first group 194? And you said yes. Yes, Your Honor. I asked you, is the second group 279? And you didn't answer that. Yeah, Your Honor, the second group of what discovery had thus far revealed was it was 279. Yes, Your Honor. We were still in the process. Because that's 473. So going back to Judge Boggs' question, how do you, I mean, I understand that the two of you have stipulated that the worn number of 500 is met here, but 473 is not 500. Yes, Your Honor. And all I would say is before completing the process of the discovery to address temporary employees who were laid off, part-time employees, and other potential people who would add to that number, the parties decided rather than expend further judicial resource completing the discovery, they could stipulate that we reach the 500 number and, therefore, if at all. So you're saying that in effect you think or you agree that the 279 is really too low and that you would have gotten to a bigger number, at least 306 presumably. Yes, Your Honor. If you had agitated further. Okay, and then did I hear you say that you represent the 194, not the 279? That's right, Your Honor. Okay, so the 279, even though they're the ones we're arguing about what happened to them, you're saying they're happy or at least they're not here. Well, that's right, Your Honor, because what Vanderbilt did by providing what we would call pay in lieu of notice is inoculate as to the September group of people. Okay, I understand that. I just wanted to be clear that they're not in effect unhappy. And I guess I would ask the question then, how are they in any sense, the 279, how are they in any sense worse off with what actually happened than had they been given warn notice? Well, Your Honor, as the Department of Labor makes clear, they do not have an actionable cause because they did receive the full value of the violation. Your Honor pointed to the language in the worker's guide where the Department of Labor actually makes this quite clear. They say in response to, in the worker's guide, the question of could we get 60 days of benefit instead of notice, it says that while this is in violation of warn, the provision of pay and benefits in place of a notice is a possible option. And because warn provides for back pay and benefits for the period of the violation for up to 60 days, generally this approach by the employer, pay in place of notice, means that the employer has already met the penalty specified in the act. So that group of people don't have damages. However, to just focus on that ignores the aggregation provision that Congress determined in express terms that an employer could not evade the requirements of the act by staging two separate groups of layoffs within 90 days such that they would not be aggregated. And that's why the fundamental issue in the case is does the aggregation provision apply? Let me ask you about the unemployment in their briefing. And then here they've asserted that these folks could not seek unemployment or could not receive unemployment benefits during this 60-day period. Do you dispute that? Your Honor, we do dispute that because as Mr. Michel stated and it's clear from the record, this was presented on a finite group of undisputed facts. The undisputed facts say nothing as to eligibility for unemployment. I don't know. Were they eligible 60 days out? Well, then you don't dispute it. You're just agnostic. It's not in the record. Well, it's not a question of what's in the record. It's a question of what the Tennessee law is. They assert the Tennessee law is one way. And I just wondered if you had any dispute about that. Because if they can't seek unemployment because they're employed, that seems like a pretty strong argument on their side. On the other hand, if they could seek unemployment because they're unemployed, that would be a pretty strong argument on your side. That's right, Your Honor. And I guess I am agnostic in that I don't know. It's not in the record. I do think it's instructive to point to this circuit's definition of employee in WARN Act cases previously, most notably in a case referred to as Kildea v. Electro Wire Products. There the question was were a certain group of employees affected employees? And this court, with actually Judge Hood sitting by appointment from the Eastern District of Kentucky, defined that since the Act clearly states that an affected employee is one who will likely suffer an employment loss as a result of a plant closing or mass layoff, it is logical that an affected employee must be an employee in order to suffer an employment loss. The regulations define an employee as an individual who is either actively working or temporarily laid off or on leave with a reasonable expectation of recall. The facts in this case are that on September 17th, this group of employees mid-shift were stopped from their job, told to collect their belongings, their access was turned off, their email was turned off, their cell phones were taken, their computers were taken, and they were sent on their way to receive these 60 days of benefit entirely regardless of whether they got other jobs in the interim. And, of course, in other cases, many times this court has pointed to the control as an indicia, excuse me, of it being an employer. And to this definition, these employees were neither actively working nor temporarily laid off. They had been sent off to receive these benefits much akin to severance if they got an 80-hour-a-week job the next day during the 60 days. The Department of Labor, also in its employment guide, and the Fourth Circuit, of course, in Dunlop, has noted that if an employee during that 60-day period gets another job, that's deemed a voluntary termination. They're no longer entitled to benefits. Here, Vanderbilt had no concern whatsoever with if those employees got another job. What they had the concern with was giving this 90 days' pay and benefits to, again, evade the requirements of the Act as to a group of employees who were terminated without notice 78 days earlier. And that first group that you represent, they didn't get the notice. I take it they didn't get any further pay after the termination? Your Honor, they got two weeks of pay and a health care. So this case, then, I take it, turns on. What's the damages here? The difference between 60 days and two weeks? Yes, Your Honor. It's the 60-day damages, pay, and benefits, minus the two weeks' pay and the $1,000 health care stipend. So the damages would be approximately 44 days and the health care costs for those 44 days, not for the 60 days. So you're fighting over six weeks' pay and benefits? That's correct, Your Honor, in terms of the monetary value. Your Honor, we'd also note, of course, Mr. Michelle Vanderbilt's counsel referred to the fact that this court, and frankly, to my knowledge, every circuit court that's addressed the definition of employment loss, has applied what's called a practical effects-driven analysis. And the court did not limit that analysis, as Mr. Michelle states, to just cases where one company is purchased by the other. To the contrary, the court clearly stated in the Wiltz case that courts addressing Section 2101A6, which is the employment loss definition, whether in the context of a sale, plant closing, or a mass layoff, have all applied this practical effects-driven analysis in their many cases cited. And we would state again that what actually happened, the practical effect to any employee experiencing it, is I've been terminated from my job today, I'm getting paid 60 days, which is going to prevent me from having worn damages, but I'm on the street to do my own thing starting tomorrow. And why that is relevant, though those employees did not themselves have damages, is the statute and the regulations interpreting that statute are very clear that the whole point of the aggregation provision is that an employer can't stage what could be one big layoff into a few to stay under that 500 threshold. The statute in Section 2102D, the aggregation provision... Oh, they can if they just space it out a little further. Exactly, Your Honor. Congress chose to put a 90-day period. One thing Vanderbilt could have done is waited 14 days longer. It just seems to me, if you're going to argue this practical effect here, I can understand your argument if in the second group  or they gave them two weeks' benefits, but the majority of these people got the worn notice and benefits. So this is not a very clever way to stage this if you're trying to evade worn. Well, it denied 200 employees of leaving their employment of 60 days pay and benefits by a staging that the statute specifically says shouldn't happen if it's designed to evade notice to 200 people. For those 200 people without a job, 60 days of notice... If you're staging this, why didn't you screw the second group of people too? Well, because at the time Vanderbilt believed the second group of people might expand past the 500-person limit on and of itself. It didn't ultimately happen, but the notice which is in the record that was sent to the government was at the time they thought it might be as much as 1,000 people in that September group. It ended up being in the 250-300 range. So that's why the notice, based on the documents in the record, was given at that time was because standing alone it would have met it. However, it didn't, in fact, and as a result should have been aggregated with that first group. I think it's important to note that the... Well, under your argument, it's going to be aggregated whether it's the smaller number or 1,000. Well, it actually cannot be aggregated once it gets to a bigger number because the statute makes clear and the regulations incorporating it that for the aggregation provision to apply, separate sets of layoffs have to individually be below the threshold and combine... I see. What's the upper threshold? Well, the threshold is 500. So if either of these were independently above 500, then the aggregation provision by its terms wouldn't apply because they're both under, but aggregate to 500 it does. I got it. Your Honors, I think it's important, of course, the statute, as the Department of Labor states, is silent as to the nature of work that must be performed, but... Let me go back to that. Yes, sure. The thrust of all of this is that they were intentionally staging this so that it didn't meet the threshold, right? Correct, Your Honor. But I just still have a remaining sort of nagging doubt. If they actually thought the second one was going to involve as many as 1,000 employees, then aggregation wouldn't apply. Well, again, the aggregation... The only way that you would be staging this to try to avoid it if you thought that the second one would be under 500. Am I understanding that correctly? Well, the aggregation... If they're both under 500, then you aggregate. Right, but it's an objective... So saying that the notice was given the second time around to the government, thinking it was going to be as high as 1,000, doesn't that, by definition, say this wasn't a scheme to avoid, Warren? By staging? Well, A, first off, the aggregation provision, though it mentions that its purpose is to avoid the evasion of the statute, it is an objective numerical determination that if two groups within 90 days, under 500... I got the objective calculations. I get that. I'm back to this thrust in the briefing and in the discussion today that there was some sort of scheme here to avoid giving this notice and to avoid aggregation, which seems to me by definition is refuted by what you've just said was the notice of what they thought the second one was going to be, which would mean aggregation didn't apply. Well, Your Honor, I do not have evidence to say that. Do I understand that correctly? I'm not asking if you agree with me. Do I at least understand it correctly? I think you understand it correctly, and I would agree there's no evidence we didn't have a trial of what the motivation and purpose was. But what is clear from this Court's precedent and from the statute and the regs is it's a broadly remedial statute that is applied numerically where within 90 days two groups aggregate to be over the threshold. I got the literal argument. I got that. I want to be clear about that because is it correct that you're saying you fire 200 people on day one and you fire 600 people on day two that you don't aggregate the two groups? Because I thought it was if you cause more than 500 to suffer an employment loss during a 90-day period, it requires you to apply warrant to everybody. I thought that was the rule. Am I just wrong? Well, Your Honor, I believe there may be ambiguity within the regulations that address that, and there also is the issue of there's a 30-day period if it's up to a third of your workforce. That's not involved. Okay, we can look at it if you don't have a good answer. I had a separate question, which was the question of whether you have to work to be employed. If you have a plant and it blows up, and you say we're going to keep you on the payroll for 60 days, but we don't know whether we're going to rebuild the factory or we're going to keep you on the payroll, period, we don't know if we're going to rebuild the factory, and after a month you say we're not going to rebuild the factory, but we're going to keep you on the payroll for another 60 days. Do you have a warrant obligation there? They're not employed once you say that they're not going to come back? Sure. No, Your Honor. What I would say is what matters is the totality of how you treat those purported employees. If you continue to give them all the benefits of employment, not A, losing total control over them by having no report back responsibility. When you say the benefits of employment, don't you look at that from the employee's point of view? Not having the boss have control over you doesn't sound like you've lost a benefit. It sounds like you've gained a benefit. Well, and I understand that, again, to the September employees, but I would say two things. One, just under this Court's previous definition, it doesn't meet it. But two, the statute's aggregation provision is designed so that even if you satisfy that one group, if you haven't met it for the first people within a 90-day period, it applies. Thank you, Your Honors. Appreciate your time. Thank you. All right, you'll have three minutes for rebuttal. Thank you, Your Honors. Just a couple points of clarification. Number one, the unemployment issue is in the record. It is attached to Exhibit D to the Joint Statement of Undisputed Facts, page 20 of 24, question and answers for Vanderbilt employees. Will I be eligible to file for unemployment? Answer, yes, after the separation period if you have not found another position. So it is right in there. And then with respect to motive and this intent to invade. You say after the separation period, you mean while they're being paid? After the 60-day leave of absence. They refer to it as a separation period in their paperwork. You will be on a separation period, a leave of absence, receive 60 days' pay and notice. And so at the conclusion of that 60 days, you're eligible to file. Of course, Vanderbilt couldn't guarantee anyone would receive unemployment, but only eligible to file if you hadn't received another job. It doesn't sort of explicitly say you can't do it before the 60 days. No, it doesn't. And anyone could go file unemployment any time. They just may be denied. With respect to this theory about Vanderbilt attempting to evade the purposes of the act, first of all, there's no fact in the record to show that. This is an improper inference. And secondly, there is no mens rea or intent requirement within the WARN Act. The WARN Act is very simple, at least with aggregation. You can aggregate. You have a set 90-day period where you can aggregate employment losses within those 90 days, and employers are entitled to rely upon those 90 days in structuring their employment actions. And finally, Your Honors. To the extent that somebody is concerned about motive here, correctly or incorrectly, could you speak to the discussion I was having with your fellow counsel about this maximum or something? If, in fact, you thought that you might lay off or terminate 1,000 people the time you gave the second notice to the government, would that then have precluded aggregation or not? No. And I know this may hurt my argument, but we'll concede that aggregation can occur within 90 days. You could have a full 500 jobs. My example of 200 and then 900 the next day, the 200 still coming in. The 200 would be entitled to notice. It doesn't matter how big the second group is if it's over 500. No, Your Honor. I got it. That's what I needed. Thank you. As a matter of both law and public policy, the 279 non-plaintiff employees did not suffer an employment loss until November 16, 2013 at the earliest. There's nothing in the WARN Act, its interpretive regulations or case law, or the legislative history that requires an employer to continue to assign job duties to employees receiving notice of an impending layoff to avoid that immediate employment loss. To the contrary, the purposes of the act are best fulfilled when an employee can have a full-time 60-day opportunity while receiving wages and benefits to find another job. And we would ask that Your Honor find that the employment terminations occurred. I suppose your argument is that clearly you would not have a problem if you had just had a New York City, they call it a rubber room or a corral, where you told the 279 come in every day, sit down here, do nothing but read the paper. That would be stupid to say that that's better than what happened here. Right. They have the opportunity to find other jobs. Thank you, Counsel. Thank you, Your Honor. The case is submitted, and the clerk may call the next case.